IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **NOKIA CORPORATION, AND NOKIA TECHNOLOGIES OY**<br><br>**Plaintiffs,**<br><br>v.<br><br>**AMAZON.COM, INC.**<br><br>**Defendants.** | Civil Action No. |

## ORIGINAL COMPLAINT

Plaintiffs Nokia Corporation and Nokia Technologies Oy ("Nokia") file this Original Complaint against Amazon.com, Inc. ("Amazon" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. Nokia is a leading innovator that has contributed greatly to the development of contemporary standards technologies. Nokia brings this action to seek a declaration that it has negotiated in good faith towards a license with Amazon. Nokia seeks a declaration that it has negotiated in good faith towards a license with Amazon and complied with any applicable intellectual property right ("IPR") policies and Nokia's relevant standard development organization declarations.

2. For example, Nokia helped to pioneer the development of modern video coding technology and has one of the strongest video coding patent portfolios in the world. Nokia's patented inventions allow video to be transmitted and received over communications networks, such as Wi-Fi or cellular networks, with high quality and dramatically lower bandwidth requirements, and minimize the amount of data it takes to receive and store these videos on mobile devices, such as mobile phones, laptop computers, and tablet computers.

1

3. For example, Nokia's patents include claims essential to decoding video according to the H.264 Advanced Video Coding Standard ("H.264") and the H.265 High Efficiency Video Coding Standard ("H.265") promulgated by the International Telecommunications Union ("ITU"). The H.264 and H.265 Standards are some of the most widely used video decoding standards in the world.

4. Amazon currently benefits and has benefitted greatly from Nokia's innovations, which among other things enable Amazon products to stream and capture high quality video more efficiently and effectively.

5. Dozens of companies have taken licenses to Nokia's essential patent claims at rates that are reasonable and non-discriminatory. Yet, despite receiving multiple offers from Nokia, Amazon has refused to take a license to any of Nokia's essential patent claims, including to Nokia's H.264 and H.265 essential decoding patent claims.

**PARTIES**

6. Plaintiff Nokia Corporation is a foreign corporation organized under the laws of Finland, located at Karakaari 7, FIN-02610, Espoo, Finland.

7. Plaintiff Nokia Technologies Oy ("Nokia Tech") is a foreign corporation organized under the laws of Finland, with its principal place of business at Karakaari 7, FIN-02610, Espoo, Finland. Nokia Tech is a wholly-owned subsidiary of Nokia Corporation.

8. Amazon.com, Inc. is a Delaware corporation with a principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

10. Complete diversity exists. Nokia Corporation and Nokia Technologies Oy are foreign corporations organized under the laws of Finland. Amazon is a Delaware corporation.

11. The amount in controversy exceeds $75,000.

12. Venue is proper in this judicial district under 28 U.S.C. § 1391.

13. This Court has general personal jurisdiction over Amazon by virtue of its incorporation in the State of Delaware. Amazon has appointed a registered agent for service of process, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

14. In addition, Amazon maintains a regular and established place of business within this District. For example, and without limitation, Amazon has maintained a regular and established place of business with offices and/or other facilities located at 1025 Boxwood Rd., Wilmington, DE 19804. At 3.8 million square feet, it is the largest Amazon fulfilment center in the United States. https://www.delawareonline.com/story/money/business/2021/09/21/amazon-opens-mega-warehouse-delaware/8347000002/. Amazon additionally maintains offices in this District including at 560 Merrimac Ave 1437, Middletown, Delaware 19709 and 820 Federal School Lane, New Castle, Delaware 19720.

**NOKIA'S INVESTMENT IN STANDARDS AND RESULTING PATENTS**

15. Nokia has consistently been one of the major contributors to wireless communication, video standards, and related technologies that enable many features that are commonplace and expected of today's consumer electronics.

16. By the mid-1990s, Nokia was developing its own proprietary video technologies, referred to as the MobiVideo Codec. In early 1998, the Video Coding Experts Group ("VCEG") of the International Telecommunication Union-Telecommunication (ITU-T) issued a call for proposals on a project called H.26L, the "L" standing for "long term."

17. The development of H.26L eventually led to ITU-T Recommendation H.264 Advanced Video Coding for Generic Audiovisual Services ("the H.264 Standard"). Thereafter, work began on the successor to the H.264 Standard, which published as ITU-T Recommendation

H.265 High Efficiency Video Coding ("the H.265 Standard"). Nokia, a video coding innovator, contributed numerous innovations to the development of both the H.264 and H.265 Standards. In addition, Nokia has developed many other video coding technologies.

18.   Over the last few decades, internet traffic has evolved from simple, text-based interfaces to a plethora of media, including video. As technology has evolved, the importance and use of video has skyrocketed. Video coding technologies, including the H.264 and H.265 Standards, are crucial to the development and evolution of modern communication particularly as video traffic has become an increasingly outsized share of total consumer Internet traffic.

19.   The H.264 and H.265 Standards enable efficient and reliable video decoding in millions of devices, including smartphones, computers, and tablets. The H.264 and H.265 Standards reduce the amount of data needed to decode digital video and are the two most prominent video decoding standards in the world. These advances in video coding technology were made possible by the work of Nokia and other video coding innovators.

20.   The H.264 Standard, first released in 2003, was designed to decode high quality video using lower bit rates than previous standards. The H.264 Standard is flexible enough to implement across a variety of applications, networks, and systems and offers vastly improved performance over previous standards, such as MPEG-2 and MPEG-4 Part 2.

21.   The H.265 Standard, first released in 2013, built on the H.264 Standard in several key respects. The H.265 Standard enables consumers to decode video with even less bandwidth than before and to decode higher quality video in higher resolutions.

22.   The rise of these new video coding technologies has enabled people to consume not only traditional broadcast programming, including news, sports, movies, shows, and other entertainment on demand, but also newer technologies including subscription video services,

short-form video, video calling and conferencing, live streaming, video sharing on social media, and video messaging on televisions, computers, and mobile devices. In particular, over the past five years, video has become the main form of internet traffic, coinciding with the rise in popularity of internet and social media apps, such as TikTok, Instagram, and Snapchat. Video was estimated to be 82% of global consumer internet traffic in 2022.

23. Nokia Corporation and its wholly owned subsidiaries have cumulatively invested over €140 billion in research and development relating to, for example, mobile communications and video coding technologies and, because of this commitment, currently owns more than 20,000 patents worldwide. Many of these patents have standard essential claims.

## NOKIA'S COMPLIANCE WITH PATENT POLICIES AND NOKIA'S RELEVANT DECLARATIONS

### A.     The ITU and the H.264 and H.265 Standardization Process

24. Certain claims of Nokia's patents relate to the H.264 and H.265 Standards developed by the ITU.

25. The ITU and the International Standards Organization ("ISO") jointly published a standard referred to as "H.264," "MPEG-4 part 10," or "Advanced Video Coding." The H.264 Standard development process was initiated by VCEG and finalized by the Joint Video Team ("JVT"), which was a collaborative effort between VCEG and the Moving Picture Experts Group ("MPEG").

26. Following publication of the H.264 Standard, the JVT began work on the H.265 Standard. The H.265 Standard, which is also known as "MPEG-H Part 2" or "High Efficiency Video Coding," represents the next step for video quality and coding efficiency after the widely successful H.264 Standard.

27. The ITU was formed in 1865 at the International Telegraph Convention and, in 1947, it became a specialized agency of the United Nations, responsible for issues that concern information and communication technologies. The ITU handles a variety of matters and thus is organized into various sectors. One of the sectors is Telecommunication Standardization or "ITU-T." The mission of ITU-T is to ensure efficient and timely production of standards related to the field of telecommunications. The standards developed by ITU-T are referred to as "Recommendations."

28. ITU-T members come together and propose technological solutions for inclusion in the draft Recommendations. The goal is to draft Recommendations that incorporate the best available technology in order to ensure that the standards are a high quality.

29. The contributions that are ultimately included in a Recommendation are often covered by one or more patent claims and thus the ITU developed the Common Patent Policy in order to assist with usage of patented technologies in its standards.

30. The ITU published Guidelines for compliance with the implementation of the Common Patent Policy. The Guidelines explain that the Common Patent Policy "was drafted in its operative part as a checklist, covering the three different cases which may arise if a Recommendation | Deliverable requires licenses for Patents to be practiced or implemented, fully or partly." [*"Guidelines for Implementation of the Common Patent Policy for ITU-T/ITURIISOIIEC,"* ITU, Rev. 4 (Dec. 16, 2022) https://www.itu.int/itudoc/itu-t/patents/policy/guide.pdf].

31. The Common Patent Policy states:

> 2. If a Recommendation | Deliverable is developed and such information as referred to in paragraph 1 has been disclosed, three different situations may arise:

> 2.1 The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.2 The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.3 The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the Recommendation | Deliverable shall not include provisions depending on the patent.
>
> 3. Whatever case applies (2.1, 2.2 or 2.3), the patent holder has to provide a written statement to be filed at ITU-TSB, ITU-BR or the offices of the CEOs of ISO or IEC, respectively, using the appropriate "Patent Statement and Licensing Declaration" form. This statement must not include additional provisions, conditions, or any other exclusion clauses in excess of what is provided for each case in the corresponding boxes of the form.

["*Common Patent Policy for ITU-TIITU-RIISOIIEC,*" ITU (2022), https://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx].

32. The Guidelines define the term "Patent" to be "those claims contained in and identified by patents, utility models and other similar statutory rights based on inventions (including applications for any of these) solely to the extent that any such claims are essential to the implementation of a Recommendation | Deliverable. Essential patents are patents that would be required to implement a specific Recommendation | Deliverable." ["*Common Patent Policy for ITU-TIITU-RIISOIIEC,*" ITU (2022), https://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx]. The definition of "Patent" provided by the Guidelines is mirrored in the Patent Statement and Licensing Declaration Form that is completed by patent holders who may have patent claims essential to the H.264 or H.265 standards. The Patent Statement and Licensing Declaration Form states that identifying specific patents on the form is optional but not required. The ITU thus deems "essential" only patent claims that are essential or necessary for implementation of a specific Recommendation.

33. The H.264 Recommendation specifies the implementation of decoders and specifically defines the "decoding process" as "[t]he process specified in this Recommendation | International Standard that reads a *bitstream* and derives *decoded pictures* from it." [Recommendation ITU-T H.264]. It does not, however, specify the implementation of encoders. The H.264 Recommendation defines "encoding process" as "[a] process, not specified in this Recommendation | International Standard, that produces a *bitstream* conforming to this Recommendation | International Standard." *Id*.

34. Similarly, the H.265 Recommendation only specifies the implementation of decoders. *See* [Recommendation ITU-T H.265] (defining (i) "decoding process" as "[t]he process specified in this Specification that reads a *bitstream* and derives *decoded pictures* from it" and (ii) "encoding process" as "[a] process not specified in this Specification that produces a *bitstream* conforming to this Specification.").

**B.    Nokia's Compliance with the ITU Common Patent Policy and Nokia's Relevant Declarations**

35. Nokia protects its investments in research and development with intellectual property. Nokia owns hundreds of patents related to video decoding technology, and continues to develop and secure intellectual property as it innovates in this industry. By voluntarily contributing its research and development innovations to the standard-setting process at ITU— through technical contributions in standardization meetings—Nokia has a large number of patent claims essential to the H.264 and H.265 Standards. Industry members attending the standardization meetings chose to adopt Nokia's technologies into the standard because of their benefits and merit.

36. Nokia has committed that it is prepared to grant licenses to any patent claims essential to the H.264 and H.265 Standards on reasonable and non-discriminatory (RAND) terms and conditions.

37. Consistent with the ITU Common Patent Policy, Nokia timely notified standard development participants that Nokia may obtain patents on its contributions, including by submitting Patent Statement and Licensing Declarations to ITU in which it declared in good faith that it is prepared to grant licenses to the essential claims of the relevant patents on RAND terms and conditions.

C. **Nokia's Negotiation with Amazon**

38. Nokia has been negotiating with Amazon in a good faith effort to license various standard essential patent claims since 2009. During this time, Amazon has sold millions of products and offered services to millions of subscribers, yet Amazon has not taken a license to any of Nokia's standard essential patent claims. Nokia has at all times been prepared to grant a license to Amazon under its standard essential patent claims.

39. The negotiations between the parties initially focused on cellular and Wi-Fi technologies, but shifted to Nokia's patent portfolio relating to the H.264 and H.265 Standards ("Nokia's Video Patents") after Amazon reduced its sales of cellular devices and increased its use of video technologies.

40. In April 2015, Nokia notified Amazon that Amazon was infringing Nokia's patents essential to the H.264 standard ("Nokia's H.264 Patents"). Nokia notified Amazon of its established industry rate for its H.264 decoding portfolio, which had already been accepted by other companies.

41. Given the parties' years of negotiations on cellular and Wi-Fi technologies, Nokia attempted to finalize an agreement with Amazon relating to cellular and Wi-Fi essential patent

claims before turning to Nokia's H.264 Patents. However, despite Nokia's good faith efforts Amazon would not agree to a license.

42.     In August, 2020, Nokia sent Amazon a list of its Video Patents and extended an offer that included a license to Nokia's Video Patents, Wi-Fi patents, and cellular patents. Nokia's offer was a lump sum structure, including a past release and license. Given Amazon's reduction of its cellular product business, Nokia's offer also included a license for Nokia's cellular patents capped at particular number of units. Nokia calculated its offer based on Nokia's standard per unit rates for its Video Patents.  Over 50 companies had previously licensed Nokia's Video Patents at this rate.

43.     Over the next five months, Nokia repeatedly followed up with Amazon, but Nokia's offer was never accepted.

44.     In March 2021, Nokia made a new offer and provided Amazon with a spreadsheet showing exactly how Nokia calculated its offer, based on Nokia's established rates for its Video Patents.  Nokia also explained that because Prime Video is one of the largest streaming services in the world, and because AWS provides video-related services to a significant number of video streamers, a license to Nokia's Video Patents for all Amazon services would cost far more than Nokia's prior lump sum offer.  Thereafter, discussions proceeded about an agreement that would cover only Amazon end-user products.

45.     After many more rounds of negotiations, on October 21, 2022, Nokia made a counteroffer that appeared to bridge the gap between the parties. Nokia offered a license to Nokia's Video Patents and cellular SEPs for Amazon end-user devices for 5 years, plus certain grant-back licenses to Nokia and release provisions, among other provisions.  Consistent with

Nokia's understanding of the prior discussions, Nokia's offer did not include a license for Prime Video, AWS, or other services.

46. The parties appeared close to finalizing a deal. Nokia sent several drafts of the proposed documents in November and December, and on December 21, 2022, Nokia agreed to go back to its management for final approval and execution of the deal. Nokia's negotiator emailed Amazon stating "[o]nce Amazon's contact info is added to Section F and you confirm the correct contracting party, **we believe this is ready for Amazon's signature**." (Emphasis added). Nokia sent Amazon an executable copy. This final executable version of a license did not include any rights for Amazon Prime Video or Amazon Web Services.

47. However, the December 2022 license was never executed. Nokia continued to negotiate in good faith to reach an agreement given the prolonged negotiations and that Amazon had yet to pay a single royalty. On March 20, 2023, Nokia extended a revised version of the compromise offer, which maintained the same payment amount, and added provisions relating to certain AWS services.

48. Given the parties' inability to reach an agreement on a lump sum arrangement that included a license to Nokia's Video Patents, wifi patents, and cellular patents, Nokia decided to make Amazon separate running royalty offers for Amazon's video-related products and services. Specifically, on July 19, 2023, Nokia sent Amazon an offer for a license to Nokia's Video Patents for Amazon end-user devices at Nokia's well-established rate. Nokia also sent Amazon a list of anonymized licenses showing other companies that have agreed to this same rate.

49. Then, on October 25, 2023, Nokia sent Amazon an offer for a license to Nokia's Video Patents for Amazon's streaming services, including Amazon Prime Video, Freevee, and

Twitch. Nokia's offer is supported by, for example, Nokia's running royalty agreements referenced above.

50. Amazon has not accepted any of Nokia's offers. To this day, Amazon has not paid a single royalty for its infringement despite Nokia's good faith efforts to negotiate.

**COUNT I: DECLARATORY JUDGMENT THAT NOKIA HAS NEGOTIATED IN GOOD FAITH TOWARDS A LICENSE WITH AMAZON AND COMPLIED WITH ANY APPLICABLE IPR POLICIES AND NOKIA'S F/RAND DECLARATIONS**

51. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

52. Amazon designs, manufactures, and markets products that utilize and comply with one or more technical standards, such as the ITU H.264 and H.265 Standards. Amazon requires a license to Nokia's essential patent claims.

53. Nokia has voluntarily declared that it is prepared to grant licenses to its essential claims on a worldwide, non-discriminatory basis and on reasonable terms and conditions.

54. Nokia has at all times been prepared and willing to grant a license to Amazon under its essential patent claims. For example, Nokia provided Amazon with lists of patents having essential claims and identified the relevant standard sections that are implemented by Amazon's products. Nokia negotiated in good faith with Amazon for years, during which time Nokia made multiple F/RAND offers, and no agreement has been reached.

55. There is a case or controversy of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment.

56. Nokia seeks a declaration that it has negotiated in good faith towards a license with Amazon and complied with its obligations under the relevant standard development organization IPR policies and Nokia's standard development organization declarations.

**PRAYER FOR RELIEF**

WHEREFORE, Nokia respectfully requests that this Court enter judgment in its favor as follows and award Nokia the following relief:

I. adjudge and declare that Nokia has negotiated in good faith towards a license with Amazon and complied with its obligations under the relevant standard development organization IPR policies and Nokia's standard development organization declarations;

II. award Nokia its costs of suit; and

III. award such other equitable relief which may be requested and to which Nokia is entitled.

Dated: October 27, 2023

Respectfully submitted,

**FARNAN LLP**

*/s/ Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St. 12th Floor
Wilmington DE 19801
Tel.: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

**MCKOOL SMITH, P.C.**

Warren H. Lipschitz*
Alexandra F. Easley*
300 Crescent Ct. Ste. 1200
Dallas, TX 75224
Tel.: (214) 978-4000
wlipschitz@mckoolsmith.com
aeasley@mckoolsmith.com

R. Mitch Verboncoeur*
303 Colorado St Suite 2100
Austin, TX 78701
Tel.: (512) 692-8700
mverboncoeur@mckoolsmith.com

**ALSTON & BIRD LLP**

Theodore Stevenson, III*
2200 Ross Ave. #2300
Dallas, TX 75201
Tel.: (214) 922-3400
ted.stevenson@alston.com

John D. Haynes*
Nicholas T. Tsui*
1201 West Peachtree Street
Atlanta, GA 30309
Tel.: (404) 881-7000
john.haynes@alston.com
nick.tsui@alston.com

**\*Local Civil Rule 83.5 motions for pro hac vice admission forthcoming**